

The Law Office of Kevin J. Keating, P.C.
666 Old Country Road, Suite 900
Garden City, NY 11530
516-222-1099 • 212-964-2702
kevin@kevinkeatinglaw.com
Garden City • Manhattan

October 31, 2022

**Via ECF and Federal Express**
Honorable Joanna Seybert
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

      Re:    United States v. Mara Ficarra
                   18-CR-679

Dear Judge Seybert:

      As Your Honor is aware, I represent Mara Ficarra, who is scheduled to be sentenced by the Court on November 4, 2022. I respectfully request that the Court consider the contents of this submission when imposing sentence.

      I write with several purposes. First, I provide an overview of the offense conduct at issue in this case. In doing so, I contrast the *vastly different* roles of John Ficarra and Mara Ficarra in the operation of the Remington business, and argue that Ms. Ficarra is deserving of a two-level minor role reduction, as her function at the entity was part-time, backroom, and administrative in nature. Next, I provide an overview of Ms. Ficarra's, otherwise, laudable life's history, characterized by adherence to the law and devotion to her family, and uncommon acts of charity to her neighbors. Thereafter, I provide detail of the extraordinarily difficult last four years of Ms. Ficarra's life. In doing so, joined by the Probation Department, I argue that Ms. Ficarra's current extraordinary family circumstances are deserving of a departure from the advisory Guidelines in this case. Finally, in concluding, I respectfully urge the Court to impose a non-incarceratory sentence in this matter.

**The Offense Conduct**

      In 2013, Mara Ficarra was 49 years old and had been married to John Ficarra for ten years. Together, they had a nine year old son named Matthew. At that time, John Ficarra conceptualized the idea of creating Remington Biographies, Inc. At the time, John Ficarra was 48 years old and without a criminal record. As such, John Ficarra incorporated Remington Biographies and became its CEO and sole shareholder of the entity. (PSR ¶ 4) The specific business model of Remington, as created by John Ficarra, was to solicit individuals for inclusion in the publication for a nominal fee. This fee, typically approximately $14.00, gave these individuals a listing within the annual

Honorable Joanna Seybert
October 31, 2022
Page 2

Remington publication. As planned by John Ficarra, all those who paid an initial listing fee would be further solicited for an upgraded enhanced biographical listing within the Remington publication, at additional cost.

With this, beginning in 2013, John Ficarra rented office space in Bohemia, New York, and additionally secured the services of two on-site salespeople to assist in his solicitation efforts. From 2013 to 2015, assisted by his sales staff, this group likely made thousands of telephone calls across the country solicitating individuals for inclusion in the Remington Biographical Registries.

Of course, these solicitations by Ficarra and his staff involved detailed conversations with individuals expressing interest in Remington and further conversations with interested parties as to upgraded enhancement options. Beyond this, of course, the annual published Remington registry had to be created as, in fact, a biographical publication indeed was created annually and mailed to all individuals contained in the registry. This involved extensive conversations with many who had opted for enhanced listings within the registry, and the writing of the various biographical data.

In 2015, John Ficarra closed the Bohemia location and resumed his operation out of a home office within the Ficarra house. John Ficarra's efforts on behalf of Remington continued as he made thousands of calls to individuals seeking solicitations and spent thousands of hours in discussion with interested parties and, undoubtedly, engaged in concerted efforts to convince people to opt into more expensive enhanced features. Undoubtedly, at some point, John Ficarra's efforts crossed the line from salesmanship to misrepresentation in his efforts to raise money for Remington. While by customary fraud standards this was not a particularly large operation, a pattern developed where John Ficarra began to not advise many of his customers that they were being charged for an upgraded and enhanced biographical listing.[1]

By every measure, Mara Ficarra's role was substantially less than John Ficarra. At the outset, of course, Mara Ficarra was responsible for raising her son, who was between the age of 9 and 16, during the offense conduct. Moreover, as will be further detailed below, during this time Mara Ficarra was also raising a second child, who she had agreed to take in, without compensation, to help out a friend from the neighborhood. Mara Ficarra's role consisted of part-time assistance to her husband in the form of backroom administrative tasks. Specifically, Mara Ficarra assisted her husband in banking and minor bookkeeping on behalf of Remington.[2]

In this regard, in their submission, the Government points to seven text messages between the defendant and her husband related to banking activities. Notably, in each, it appears that the defendant is taking direction from John Ficarra. For example, on November 1, 2016, the defendant texts her husband advising that there are no funds available for (a particular customer) at this time and her husband advises, "next week try 475". In another, the defendant advises her husband of the existence of a chargeback on the Remington account. In another, the defendant advises her

---

[1] The Government's estimate of the loss is approximately $1.9 million over a six year period, which averages out to revenues for Remington of approximately $300,000.00. Of course, Remington had considerable costs associated with the venture which included the creation and manufacturing of the annual biographical directory.
[2] Remington had an outside accountant who filed quarterly and annual returns for the entity.

husband that their bank is closing their account, and her husband advises her to try to locate a credit union in which Remington could establish an account, and he gives her direction in that regard.

In short, Mara Ficarra has accepted responsibility for her conduct in this matter. But there can be no credible dispute that Mara Ficarra's role and function in this event was substantially less than John Ficarra, and minor. It was John Ficarra who created and conceptualized the Remington registry and, along with his sales staff, contacted thousands of people throughout the country to secure their inclusion in the registry. It was John Ficarra, the CEO and owner of Remington, who spoke to thousands of individuals during which he made concerted efforts to secure their entry into an elevated listing. Of course, it was John Ficarra who, on occasion, failed to disclose to the customers with whom he was speaking that their accounts would be debited for an elevating listing. It was John Ficarra who was responsible for the content of the pamphlets that were mailed to thousands of individuals detailing the Remington registry and the opportunities for inclusion in the biography. It was John Ficarra who authored the elevated biographical listings within the directory. And it was John Ficarra who gave direction to Mara Ficarra with regard to the part-time bookkeeping/banking assistance she provided to her husband. As such, under the facts of this case, a two level minor role reduction is appropriate.

**The Defendant's Laudable Life's History Has Been Otherwise Characterized By Devotion To Her Family, Law-Abiding Behavior, And Uncommon Acts Of Charity. Moreover, Her Present Family Circumstances Are Extraordinary, Warranting Departure By This Court**

Ms. Ficarra is 58 years old and was born and raised in Brooklyn, New York under middle income circumstances. Her father worked at a bank, and her mother a homemaker. When she was a young child, her family moved to East Northport, where Mara attended school and graduated John Glen High School. She thereafter attended the State University of New York in Plattsburgh. She was an average student, and graduated in 1986 with a Bachelor's degree in accounting.

Ms. Ficarra has advised probation that her childhood was "perfect," without any form of abuse, and raised by parents who made "marriage look easy". Immediately after graduating college, Ms. Ficarra began working for a AIG Insurance Company in New York City. Thereafter, from 1987 through 2000, she worked as an auditor for Home Insurance Company in New York City. Thereafter, through 2004, she worked for Amtrust in Manhattan.

Throughout this entire period of time, Ms. Ficarra commuted from Suffolk County into Manhattan. In 1992, at the age of 28, Ms. Ficarra married, a union that would end two years later without children. In 2003, when she was 39 years old, she married John Ficarra. Together they had one child, Matthew Ficarra, who is now 18 years old and a recent high school graduate. In 1998, Mara purchased a home in Southampton, New York where Ms. Ficarra still resides. While the Probation Department notes that the home is located in an upper, middle income area of

Southampton, it is a modest size home which was purchased $124,000, and in a middle income section of the community.[3]

John and Mara Ficarra were arrested in 2018, when she was 54 years old. It is not overselling the case to state that the last four years of Mara Ficarra's life have been incomprehensibly difficult, and her suffering, immense. As noted above, John Ficarra died on July 7, 2021, at the age of 54. Following their 2018 arrest, John Ficarra's generally poor state of health began to spiral downwardly. In a four year span, John Ficarra was hospitalized on approximately 20 occasions. After suffering another heart attack after his arrest, Ficarra's health began to significantly deteriorate as his organs began to fail in cascading fashion. During a three year period of time, Ficarra had five surgeries and as noted, approximately 20 hospitalizations. In the last 18 months of his life he suffered with diabetes, septic leg ulcers, incontinence, and renal failure which required that he be taken to dialysis four days a week. During the last year of his life he was wheelchair bound, and on oxygen.

Throughout this three year period, Mara Ficarra was her husband's care provider, while at the same time being the mother and care provider to her son, who during this period had begun his freshman year in high school. Mercifully, John Ficarra passed away in July 2021. Of course, throughout this period, and to this day, Mara Ficarra has tried to emotionally and financially support her son. In this regard, as is reflected in the PSR, in September 2020, she obtained employment as a site bus coordinator for the Diocese of Rockville Centre. Her gross monthly earnings are approximately $2,900. She additionally worked for a period for Uber Eats, until the company discontinued her employment upon learning of the pendency of this matter.

As reflected in the PSR, Mara currently lives in her home with her 18 year old son and her elderly mother, for whom Mara Ficarra is the primary and only caregiver. Her mother suffers from a myriad of health problems, and does not drive a motor vehicle. As noted, Mara is also the sole surviving parent to her son for whom she provides financial and parenting support. As correctly noted by the Probation Department, Ficarra's family circumstances may be considered as a basis for downward departure. In fact, it is respectfully submitted that the family circumstances here are quite significant warranting significant consideration by this Court.

Enclosed are several testimonials offered on Ficarra's behalf. The first is from Brandon Mendez, who conveys a remarkable and moving story to the Court about Mara Ficarra. Brandon is a freshman at Quinnipiac University, and he credits his successful path to Mara Ficarra. He advises the Court that when he was a young boy his father left the home resulting in the need for his mother to work on a full-time basis working as a live-in care provider to a neighborhood individual. It was at this point that Mara Ficarra agreed to take Brandon into the Ficarra house, without compensation, where he would remain until the age of 18. Brandon writes that his "future was already set as the son of an only child immigrant, but that changed once my mother and I met Mara Ficarra." Brandon writes that Mara took him to his first soccer game, picked him up from school, helped with homework, and mentored him. He writes that Mara has "created a life for me to live and explore." Movingly, he advises the Court that "my mother and I talk about how our

---

[3] Of course, Ms. Ficarra now faces the entry of a forfeiture judgment which will eliminate all the equity value in the home she has owned for nearly 25 years.

life would be without her, and we can't even picture it because we know we would have nothing." Brandon Mendez pleads with the Court not to take Mara away from him.

Brandon's mother, Marta Aguilar corroborates these facts. She writes that Mara is "my best friend." She advises that indeed Mara cared for Brandon from the age of 6 until 18 as she worked at a full-time job. She details Mara's involvement in her son's life at the Tuckahoe School from the first to eighth grade. She writes that Brandon and Mara's son, Matthew, went to different high schools, but Mara "still drove Brandon everywhere" even when her son was 14 and obtained a part-time job, she writes that Mara used to drive her son to school, and then to the part-time jobs that he had. And, when it was time for her son to plan college, it was Mara who helped him with "all the paperwork," noting that Mara had also enrolled her son in special programs as a child to assist him with math. She, too, pleads that Your Honor not incarcerate Mara.

Matthew Ficarra, Mara's 18 year old son, advises that he lost his father at the age of 16 years old, and that he graduated St. John Baptist High School in June of this year. He suffers with a severe anxiety disorder and pleads with the Court to allow his mother to continue to remain present in his life. He, too, writes of Brandon becoming part of the family when he was six years old—an individual who has become Matthew's best friend. He writes of his father's severe medical episodes, and he recalls "shaking and crying in tears." He details his mother's incredible efforts to care for his father in his last years. He advises the Court:

> I need her in my life to guide me. Since my dad died when I was 16 years old, I feel like a lost soul drifting through the universe, but with God, he has given me my beautiful beloved mother, who I cannot live without in my life

Estelle Abisror, Mara Ficarra's 84 year old mother, also pleads with the Court, and highlights the significance of Mara Ficarra's family circumstances. She writes of her years of health problems, including leukemia. She details the years of her daughter caring for her failing husband, while also caring for her during her significant medical episodes. She advises that since John Ficarra died, she moved in with Mara, as she requires blood infusions at the New York Cancer Center, and suffers with high blood pressure; thyroid disease, and imbalance issues which her require her to use handicap rails on stairs. She concludes by truthfully pleading that the Court not take Mara from her, as "I don't know what I would do without her. I have no one to take care of me."

As set forth herein, Mara Ficarra's life's history has been largely characterized by law-abiding behavior, hard work, devotion to her family, and acts of charity. Remington was her husband's creation, and a business he ran as its owner. As noted, for its first two years, Remington operated at an office location, without Mara Ficarra, only returning to the home location in 2015. From that point forward, virtually all the Remington business was conducted by John Ficarra, including, among other things, all client contact, and securing all client orders. Mara Ficarra's role was distinct and nominal. She functioned as a part-time assistant on bookkeeping matters, who took direction from her husband.

The last four years of Mara Ficarra's life have been extraordinarily difficult. Beyond her arrest, she acted as a care provider under incredibly difficult circumstances for her husband for three years. At the same time, she raised her son, and Brandon Mendez, who both resided in the household and relied on Mara Ficarra for financial and parental support.

Today, she is the care provider to her 18 year old son and her elderly mother, who relies on Mara for housing, support, and as a primary caregiver. Simply put, were Mara Ficarra to be absent from the home, there is nobody to house, support, or care for her ailing mother.

In short, based upon the totality of circumstances surrounding this case, and Mara Ficarra's life history, and present extraordinary family circumstances, it is respectfully submitted that a non-incarceratory sentence is appropriate.

I will be prepared to elaborate on these issues at the sentencing proceeding.

Thank you for your consideration.

Very truly yours,

/s/ *Kevin J. Keating*

KEVIN J. KEATING

KJK/dg
Enc.

cc: AUSA Catherine Mirabile

Brandon Mendez * 22 Dellaria Ave * 631-268-8025* mendezbrandon311@gamil.com

October 20th, 2022

Honorable Joanna Seybert
United States District
Eastern District of New York 100 Federal Plaza
Central Islip, Ny 11722

Dear Judge Seybert,

 My name is Brandon Mendez, and I attend Quinnipiac University in Hamden, Connecticut. I am a freshman studying nursing, hoping to have a successful career in healthcare. Originally, my parents are El Salvadorean and Costa Rican, but I was born in the United States in New York. Neither of my parents had a college education and worked minimum-wage jobs to support us. My father left my mother and me when I was about six years old, which changed the entire dynamic of my lifestyle. I was nothing and had nothing. My mother could no longer afford to pay rent, and we were forced to move. Around this time, my mother and I were fortunate enough to meet Mara and her lovely family. It seemed my future was already set as the son of an only-child immigrant, but all that changed once my mother and I met Mara Ficarra. Mara introduced my mother and me to hope, something we had previously been unfamiliar with. She gave me a home, friends, family, and, most importantly, love. I stayed with her most of the time despite having a family of her own and a husband who was very sick. Mara took me to my first soccer games, picked me up from school, helped me with my homework, babysat me, and mentored me. The home where I have my own room will always be Mara's.

 There are a couple of words that come to mind when I think about Mara Ficarra, and they are inclusive, empathic, compassionate, and beautiful. I would not be where I am today or the man I am without Mara. I have always told myself I have two moms, my biological mother, and Mara. I also considered Mara's husband, John Ficarra, who passed away recently, my father. The Ficarra family will always hold a special place in my heart. They have created a life for me to live and explore. It upsets me that my mother never had a Mara in her life when she was young. If Mara had been there for my mother, who knows what she would have accomplished or how her life might have been different. From personal experience, I can tell you that the sky is the limit. Mara continues to motivate me every day, with or without her. Sometimes, my mother and I talk about how our life would be without her, and we can't even picture it because we know we would have nothing. Mara is the type of person our world and society today need. She is strong, intelligent, and independent and I cannot express my gratitude for her. Everyone in the world needs a Mara in their life, so please don't take mine away from me.

Sincerely,

Brandon Mendez

*[DocuSigned by: Brandon Mendez, 630F711E945F4C1...]*

Honorable Joanna Seybert
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, N.Y. 11722

Re: Mara Ficarra

Dear Judge Seybert,

Hello, my name is Brandon Mendez and I am interpreting my mother's letter because she is not fluent in English and struggles to read/write. These are my mothers words:

My name is Marta Aguilar. My son is Brandon Mendez. He is 18. I am a single mom. I am 46 years old. Mara is Brandon's second mom. Mara is his Godmother. John was like a father to him. John was his Godfather. Mara is my angel.

  I ask you from my heart not to put in the jail. She is my best friend. She took care of Brandon for me when he was 6 until 18 without any compensation. . I work a full time job. Brandon met Matthew at school in first grade. Brandon took his bike to Matthews house to visit. I saw Mara and John were so nice. It was a happy home and marriage. They like animals. There are two dogs and a cat. I trusted them to take care of my son. I did not have to worry. The family loved having Brandon there and he loved them too. All of us became a family. Brandon went with them to all the family party and family trips to see Johns parents. Mara always spent her time taking care of the boys and driving them everywhere. She drive them to school and back, all sports like soccer, tennis, baseball, flag football and golf. Mara was very involved in the Tuckahoe School from 1st grade to 8th grade. She went on school trips, helped with holiday events, read to the children who have no one to read to them. She helped with homework, cooked, cleaned and even took them to the hospital to see John alot. Mara was on everyone's emergency list. Matthew met a lot of kids that were single mom and dads .She helped them all. The kids slept over while the parents traveled. Mara got them to school. In an emergency she could take Brandon in or out of school. She took him to the doctors. In the elementary years during the summer they went to camp and played summer sports. Mara went to all the games.
  As they got older the boys went to different high schools. Brandon went to Southampton High School and Mara still drove him everywhere. My son always liked sports and had a busy social life. He started working at 14 and Mara continued to do all that driving. Mara also had to drive Matt to summer school and for football practice in 2017. There was no bus.
As John health was failing in 2018, he wanted Brandon to get his license fast so he taught him how to drive and he got his junior license. On July 21 John died. Everyone was very sad. Mara finished teaching Brandon how to drive and took him for his road test. He used her car and passed. When it was time to get ready for college he asked Mara to help him with all the paperwork and recommendation letter he needed. She also at a very young age signed them up

for a Kumon program to advance them in math. She drove them in so much summer traffic. She also put them in a Sat review course to advance them.

Judge Seybert, honest I do not know what Brandon and I would do without Mara in our life. She has always taken care of so many people from the first day I met her until now. She also took care of a 96 year old man called Grandpa Roy he called her his daughter. The boys took Johns death very very hard. They both cannot handle his loss. My son got a huge tattoo with Johns name in his honor. To lose Mara would really break their hearts even more than John.

Thank you,
Marta Aguilar

Honorable Judge Joanna Seybert
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, NY, 11722

Re: My Beloved Mother, Mara Ficarra

Dear Judge Seybert

My name is Matthew Alexander Ficarra, I am the son of Mara Ficarra & the Son of John Alexander Ficarra. I am 18 years old, I have lost my Dad at a very young age of 16 years old, Due to his very poor health. I graduated at Saint John the Baptist High School this year of June 2022. I also suffer from a severe anxiety stress disorder.

I am pleading with you to NOT send my mother to Jail, I do not know where in life I would be without my mother who is always there for me. I am very thankful to God that I have a mother who has taught me how to be kind, caring, & loving to others. My mother has a good heart & a amazing Personality. Her Greatest skill in life is being an amazing caregiver to my Dad, friends, and Grandparents. For Example:

— Throughout Grade School & part of High School, my mom has taken care of an 86 year old man who was diagnosed with cancer & was also a veteran. He lived next door to my house and was like a grampa to me. My mom took care of him until he was 96 years old.

— At the age of 6 years old I have met Brandon at a birthday party & we instantly became Great Friends. He rode over to my house on his bike and wanted to sleep over right away. His mom worked a lot of hours all of the time. Due to Brandon's hard life both his mom and Dad were hardly around, my wonderful mother took him in, he was more then a brother to me and my parents took him every where with us, He came to family parties, my parents payed for h

Bob, ~~racquetball~~, vacations, football games, baseball games, Nascar racing, go cart racing, bumper cars, museums, Aquariums, hockey games, bike riding, lego land, bowling, golf, and boating. My Dad was also the coach of little league baseball and flag football. From the time he was 6 years old until the age of 18 years old, he ~~[redacted]~~

— From the age of 8-11 years old my mom also took care of my other friends Nicholas and his sister Emma whose parents went through a terrible divorce. My mom helped both of the parents out to & from school. Having them sleep over when the parents were out of town or work.

— At the age of 11-18, my mom helped another divorced family by driving their son Luke back and fourth from school, to his summer Job, and also stayed over on occassion when both parents were traveling outside of own.

— My Grandma & Grampa on my Dad's side asked my Mother to take care of both of them in 2017 and in 2018 full time. They wanted to leave Florida & move in with us. My Grandma & Grampa loved me more than anything.

When I was 8 years old my Dad had a massive heart attack at his office. He was in the ambulance and they were losing him we raced to the hospital in South Side where he needed 3 stents. My Dad continued to work. ~~[redacted]~~ At the age of 11 my Dad's kidney bursted & he was in tremendous pain. I remember the ambulance in the driveway, he could barley move, they had trouble getting him out of the door. This scare tramatized me to the point where I was shaking & crying in tears. My dad barley pulled through and he got to come home. He still would write his biographies for his customers from the hospital bed.

and many more days in dialysis. During the times of Covid I chose Online Learning so I can be home, to help my mom take care of my Dad because I was the strongest one that could carry him. He had three more heart attacks this time he was pronounced dead for 10 minutes. I prayed to God and he came back to life. He was in intensive care he could hardly breathe. When he came home he needed oxygen tanks to breathe. We had full time care. He lost the use of his legs and I carried him in and out of the ambulance and Wheeled him all over in the wheel chair. He went to rehab and no one was allowed to see him except outside the window, My dad was crying to come home He wanted my mother to take care of him. If It wasn't for my mother that day my dad would of had never survived.

In the Summer of July, 2021 I got a job working in the back of an Italian Restaurant. My Dad was very proud of me. On July 7th my mom picked me up from work and my mom got a phone call that my Dad was pronounced dead and we went home and we were devastated. After telling my Great Friend Brenden, him and I did not know how to deal with his death. I already at the time lost my grandma from Covid, Easter time, Now losing my dad on July 7th, I'm also worried about losing my grandma Estelle next her health is getting worse are She's now 84 years old. Also Including the death of my Grandpa who died July of 2019.

My mom is an angel from the heavens & God. No one in the world has the love and care that my mom has. I love my mom very much, She is wonderful Positive, Amazing Person. I need her in my life to guide me. Since my D died at the age of 16 years old, I feel like a lost soul drifting through the universe, but with God he has given me my beautiful beloved mother who I Can't live without in my life, My mom can't live without me either.

My mom now spends her time taking care of disabled eldery people and serves her community by volunteering her time and taking care of our honored veterans. I want to thank you Judge Seybert for reading this letter, I love my mom very much and she means MORE than the world to me.

Sincerely, Matthew Alexander Ficarra

United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip N.Y. 11722

Re Mara Ficarra

Dear Judge Seybert,

My name is Estelle Abisror, I am the mother of Mara Ficarra and the Grandmother of Matthew. I am 84 years old, have serious health Issues.

I am pleadding with you not to send her to Jail. My daughter is everything to me and has always taken care of me. When I was 56 my husband died of an annurism, Died right in front of me. I was in Shock! My daughter moved back home to take care of me. I needed a gall bladder operation, a bladder operation, a partial hysterectomy.

Had chest pains and needed to see the heart doctor and continued with follow up appointments. She continued to take care of me always even though John was very sick.

At the age of 65 I came down with Leukemia and they gave me a year to live, with some miracle I didnt die. I was hospitalized for 5 months. Maras inlaws came in for months to take care of Matt and John so Mara was free to spend more time with me at the Hospital every day. When I got released she took me for the chemotherapy as an outpatient.

Mara took me to the emergency room the portIN for the chemo as an outPatient.

As the years went on Johns health was becoming compromised and she still made the time to take me to my multiple doctor appointments while living in Soothampton.

I also had my esophogus stretched a few Times.

I Took a bad fall Nov 2020 was in rehab Till January 2021. My daughter came all hours of the day, and sometimes at night, They were open 24/7. She brought me everything I needed and took me as an outpatient for an MRI to see if I could stand on my feet again because my knee buckled Multiple out patient visits were required While I was there in order To get released.

Then John died In July 2021. Mara was the same age as me 56 when Mara became a widow. Mara always took care of her husband. She was always by his side fighting to keep him alive and a lot of time drove him To hospitals For better care far form home, for better care. She is an angel. I moved in right away because I have anemia and require blood Infusions at the N.Y. cancer Center, I have high blood Pressure, Thyroid Issues, I cant drive, I am dizzy I loose my balance. I have a chronic bladder Infection that wont heal and diagnosed with blood in my stool, A hearing problem. I have Irritable bowel syndrome, very painful

I need the handicap rails to go up the stairs. Set up for John to be able to go up the front stoop.

Judge Seybert, I beg of you not to take my daughter Mara from me. I dont know what I would do without her. I have no one to take care of me.

god Bless You

Estelle Abisror